**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATHANIEL SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-9085 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| JASON STEWART et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In his governing first amended complaint [41], pro se Plaintiff Nathaniel Smith asserts a Section 1983 claim against the City of Mendota, Illinois, Sergeant Jason Stewart, Officer Paul Peterson, and Police Chief Tom Smith for alleged use of excessive force during his arrest on December 12, 2017. Currently before the Court are Defendants' motion for summary judgment [55], Defendants' motion for sanctions [65], and Plaintiff's motion to dismiss Defendants' motion for summary judgment [71]. For the following reasons, Defendants' motion for summary judgment [55] is granted and Plaintiff's motion to dismiss [71] is denied. In view of the disposition in favor of Defendants on the merits, Defendants' motion for dismissal with prejudice as a sanction for Plaintiff's harassing and vulgar communications with defense counsel [65] is denied as moot. However, given the egregious and highly inappropriate nature of those communications, the Court will refer Plaintiff to the Executive Committee of the Northern District of Illinois for a determination of whether to impose filing restrictions or other sanctions and/or discipline on Plaintiff. Because this order resolves all of the remaining claims in the case, a final judgment will be entered under Federal Rule of Civil Procedure 58 in favor of Defendants and against Plaintiff and this civil case will be terminated.

# I. Summary Judgment

## A. Background

The following facts are taken from Defendants' Local Rule 56.1 statement [57], which is properly supported by citations to the record in accordance with Local Rule 56.1. The record includes sworn declarations from Officer Peterson, Sergeant Smith, and Chief Smith; the Mendota Police Department's case report from December 12, 2017; video taken from Officer Peterson's body camera and from the in-house camera in the Mendota Police Department's report room on December 12, 2017; Plaintiff's deposition transcript; Plaintiff's medical records; and a transcript of Plaintiff's allegedly harassing text messages.[1]

Plaintiff has not filed a response to Defendants' Local Rule 56.1 statement or supported his arguments with affidavits or other materials, as required by the local rules. In particular, Local Rule 56.1(b)(3) requires a party opposing summary judgment to file a response to the movant's 56.1 statement with "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Plaintiff also received notice that he "must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising material issues of fact for trial" and that "[a]ny witness statements must be in the form of affidavits." [69] at 1. Due to Plaintiff's failure to comply with these rules, the Court would be well within its discretion to deem all of Defendants' factual statements admitted. See *Wilson v. Kautex, Inc.*, 371 Fed. Appx. 663, 664 (7th Cir. 2010) (explaining that it is "well within the district court's discretion" to strictly enforce Local Rule 56.1, even where the plaintiff "is a pro se litigant"); *Smith v. State Farm Ins. Co.*, 347 Fed. Appx. 228, 230 (7th Cir. 2009) (affirming grant

---

[1] Chief Smith's declaration authenticates the case report, videos, and text messages. See [57-3] at 2-3.

of summary judgment against pro se plaintiff who failed to rebut defendant insurer's factual assertions with admissible evidence after being apprised of the consequences of failing to do so).

Nonetheless, out of an abundance and taking into account Plaintiff's pro se status and various medical issues,[2] the Court has also carefully reviewed and considered the full transcript of Plaintiff's deposition, see [57-7], as well as the unsworn factual allegations contained in Plaintiff's complaint [41] and various responses to summary judgment, see [61], [71], [74], [75], [86], [87]. However, to the extent that Plaintiff's version of events is "blatantly contradicted" by the video evidence submitted by Defendants, "so that no reasonable jury could believe it," the Supreme Court has instructed that the district could "should not adopt that version of the facts for purposes of ruling" on Defendants' motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007); see also *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) ("[W]hen video footage clearly contradicts the nonmovant's claims, we may consider that video footage without favoring the nonmovant. This is because on summary judgment we view the facts in the light most favorable to the nonmovant only if there is a genuine dispute about those facts. When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage."). Instead, the district court is to view the facts in the light depicted by the videotapes that captured the events underlying Plaintiff's excessive force claim. *Scott*, 550 U.S. at 381 (in considering motion for summary judgment that raised factual issue of whether motorist fleeing law enforcement officials was driving in a way that endangered

_____

[2] In his deposition, Plaintiff stated that he is schizophrenic, bipolar, and has a degenerative back injury caused by a car accident when he was a teenager. See [57-7] at 4, Tr. p. 11. Plaintiff also stated that "I'm disabled, and that is … partly why I had asked for an appointed counsel." *Id.*, Tr. p. 10:20-21. However, the docket in this case shows that Plaintiff never filed a motion for attorney representation or an application to proceed *in forma pauperis*, which are prerequisites for recruitment of counsel by the Court. See 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel."). In response to the Court's order directing him to either pay the filing fee or submit an application to proceed *in forma pauperis* [5], Plaintiff paid the filing fee, see [6].

human life at the time police officer rammed motorist's car from behind to put end to chase, courts could not rely upon motorist's version of events, which was so utterly discredited by the record that no reasonable jury could have believed him, and instead had to view facts in the light depicted by videotape that captured events underlying motorist's excessive force claim); see also *Johnson v. Moeller*, 269 Fed. Appx. 593, 596 (7th Cir. 2008) (police officers did not use excessive force against pretrial detainee, despite detainee's contention that officer struck him six to eight times in head, where security tape showed that after detainee hit one officer, other officer struck him only once in back with metal restraints, drove him to floor, and handcuffed him, medical evaluation that was conducted same day as altercation contradicted detainee's account of severe beating, and there was no evidence that tape had been edited).[3]

At the time relevant to the complaint, Plaintiff Nathaniel Smith ("Plaintiff") was a resident of Mendota, Illinois. Defendant Paul Peterson ("Officer Peterson") is a police officer with the Mendota Police Department ("Department"). Defendant Jason Stewart ("Sergeant Stewart") is a police sergeant with the Department and Officer Peterson's supervisor. Defendant Thomas Smith ("Chief Smith") was the Police Chief at the time relevant to the complaint, but has since retired.

On December 12, 2017, Plaintiff was at the Mendota Police Station ("Station"). Officer Peterson and Sergeant Stewart were on duty at the Station. According to his declaration, Chief Smith was not at the Station; Plaintiff also testified that he did not recall seeing Chief Smith at the Station. Around 3:00 p.m., Plaintiff met with Officer Peterson concerning harassing text messages that Plaintiff had allegedly sent to a woman (the "complainant"). Officer Peterson took Plaintiff

---

[3] There is no evidence that the videos have been altered in any way and Chief Smith has provided a sworn declaration that the videos provided are true, accurate, and unedited video recordings made in the ordinary course of business at the Mendota Police Department. Plaintiff claims that the videos contain gaps, but the Court has reviewed them and at most the videos freeze for a few seconds here and there, but not in places that are relevant to the parties' arguments or the Court's analysis.

into the report room for questioning. Officer Peterson read Plaintiff his Miranda rights and then questioned Plaintiff about his alleged threatening text messages and social media post directed at the complainant and her brother. At his deposition, Plaintiff would neither admit nor deny sending the messages. See [57-7] at 12, Tr. p. 42:6-10. At Plaintiff's prompting, Plaintiff and Officer Peterson also discussed other, unrelated events, including a murder that Plaintiff claimed to believe occurred 14 years earlier. Plaintiff was not handcuffed or searched for this entire period, which lasted for about 1 hour and 39 minutes and is captured on Officer Peterson's body camera and the in-house camera in the report room.

At the end of the interview, Officer Peterson left the room to speak to Sergeant Stewart and the complainant. The complainant decided that she wanted to press charges against Plaintiff. Officer Peterson and Sergeant Stewart re-entered the report room together. They explained to Plaintiff that he was being charged with harassment. Officer Peterson asked Plaintiff to stand and take off his jacket and two sweatshirts so that he could be searched. It is part of the Department's training and protocol to search a person when he is placed under arrest. This is done for the safety of the arrestee, the arresting officer, and other persons in the area. The search includes the groin and crotch area because, as officers are taught in training, weapons and contraband can be hidden in those areas.

Plaintiff turned and faced the wall and Officer Peterson conducted the frisk by patting down Plaintiff's torso, legs, and groin area and emptying Plaintiff's pants pockets. See [57-6], Ex. F, video from in-house camera, approx. 4:40 to 4:42 p.m. The video shows that Plaintiff did not verbalize any objection to or concerns about how he was positioned against the wall; the pat-down lasted less than a minute; neither Officer Peterson nor Plaintiff made any sudden movements; and Plaintiff gave no verbal indication that he was in pain at any point during the frisk. During the

pat-down, Plaintiff offered, "if you want me to get naked I will"; Officer Peterson declined the offer. *Id.* Officer Peterson conducted the frisk under the watch of his supervisor, Sergeant Stewart. Officer Peterson and Sergeant Stewart were aware that the in-house camera would capture the frisk. The video from the in-house camera obviously contradicts Plaintiff's deposition testimony that Officer Peterson "shook his pants hard and furiously," [57-7] at 10, Tr. p. 34:11-22, which is what Plaintiff claims injured his testicles, back, and knees, see *id.* at Tr. pp. 34-35. The video does not record any shaking of Plaintiff's pants, much less shaking that could be characterized as "hard" or "furious."

Immediately after he was frisked, Plaintiff sat down on the bench in the report room. Officer Peterson handcuffed Plaintiff's right wrist to the bench at approximately 4:41 p.m. Less than two minutes later, Plaintiff complained that the handcuff was too tight and hurting his wrist. Officer Stewart responded, "good," but then immediately said "I can loosen it," approached Plaintiff, and proceeded to loosen the handcuff. See [57-6], Ex. F, approx. 4:42 to 4:43 p.m. Officer Stewart noted that he could fit his finger through the handcuff on Plaintiff's wrist. After Officer Stewart loosened the handcuff on Plaintiff's wrist, Plaintiff slid to the left, away from his handcuffed wrist, pulling his right wrist against the handcuff, despite Officer Stewart repeatedly telling him to move in the other direction. Plaintiff remained in the handcuff for approximately seven minutes more. During that time, Plaintiff complained, in conversational tones, that he was having extreme back pain, that Officer Stewart had hurt his testicles during the pat-down, and that the handcuff was tight on his wrist. Officer Stewart offered Plaintiff the options of seeking medical treatment immediately or proceeding to fingerprinting. Plaintiff chose to proceed to fingerprinting. At approximately 4:50 p.m., Officer Peterson released Plaintiff from the handcuff so that he could be taken for booking and fingerprinting. Plaintiff was in the handcuff for less than ten minutes

total.  During the time Plaintiff was cuffed, at least one officer was in the room, except for a period of approximately 15 seconds around 4:43 p.m.

The video from the in-house camera obviously contradicts Plaintiff's deposition testimony that: (1) he was handcuffed behind his back, after asking the officers to handcuff him in the front, rather than the back, because of an old injury, see [57-7] at 7-8, Tr. pp. 23:22-24:3, 25:14-17; 26:1-6; (2) he was handcuffed to the bench too tightly for "a period of hours" and "no less than an hour and 40 minutes," *id.* at 8, Tr. pp. 26:18-23, 28:17-22; (3) "for most of the time I was even in the police station I was handcuffed, just sitting there with no officers in the room, begging for them to loosen the cuffs," *id.* at 10, Tr. p. 36:12-15; (4) his handcuffs were loosened only after "much begging and screaming" for "over an hour," *id.* at 8, Tr. p. 29:12-23; and (5) when the officers loosened the cuff, "they did finally admit that it was too tight," *id.* at 9, Tr. p. 30:11-15.  In addition, while Plaintiff testified that his wrist still hurt after the cuff was loosened due to "swelling," he did not testify that the cuff was still too tight after it was loosened.  *Id.*, Tr. p. 33:4-17; see also [74] at 2-4 (Plaintiff's response to summary judgment asserting that Officer Peterson and Sergeant Stewart "did not respond to my plea for them to loosen my handcuffs until it was too late" and "[f]inally I believe over an hour later I then received help when Officer Peterson loosened the cuffs only after the damage was done").

Officer Stewart and Sergeant Smith escorted Plaintiff from the report room to be booked and fingerprinted.  In his complaint, Plaintiff alleged that on the way to be fingerprinted, Sergeant Stewart "touched [him] twice, one time grabbing [his] shirt chest and pulling [him] with his hands."  [41] at 7.  Plaintiff did not mention this alleged contact in his deposition, and his medical records from visiting the emergency room the next day do not mention such contact or any injury to Plaintiff's chest.

After booking Plaintiff, Sergeant Stewart escorted Plaintiff back into the report room. Plaintiff was not handcuffed when he re-entered the report room or at any time prior to leaving the Station. After re-entering the report room, Plaintiff posted bond for $150. Instead of leaving after paying bail, Plaintiff stayed for an additional 15 minutes to talk about the murder he believed occurred 14 years ago.

The day after his arrest, on December 13, 2017, Plaintiff visited St. Elizabeth Hospital's emergency room. Plaintiff complained of back, wrist, and testicular pain allegedly from injuries sustained during his arrest on December 12, 2017. According to the medical records included with Defendants' Local Rule 56.1 statement, Plaintiff had musculoskeletal back pain (which Plaintiff had also reported when he visited the emergency room a week earlier); Plaintiff's wrist showed no loss of strength or range of motion, but had a contusion (i.e. bruise); and both of Plaintiff's testes were "normal" and showed "no swelling and no tenderness." [57-8] at 26-27. Plaintiff returned to the emergency room on December 23, 2017. The medical records provided by Defendants indicate that Plaintiff complained of body aches, fever, and coughing; that Plaintiff was negative for testicular pain and had a normal range of motion; and that Plaintiff did not report any back or wrist pain.

### B.     Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by *** citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material

fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

**C.  Analysis**

Plaintiff's pro se amended complaint, which is brought pursuant to 42 U.S.C. § 1983, alleges a Fourth Amendment excessive force claim against Defendants. "An excessive-force claim requires an assessment of whether the officer's use of force was objectively reasonable under the circumstances." *Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir. 2018) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Court must consider "the totality of the facts and circumstances" and perform "a 'careful balancing of the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Strand v. Minchuk*, 910 F.3d 909, 914 (7th Cir. 2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)). The Court gives attention to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The proper inquiry is one of 'objective' reasonableness that proceeds without regard to the subjective 'intent or motivation' of the officer." *Strand*, 910 F.3d at 914-15 (quoting *Graham*, 490 U.S. at 397). "Whether a particular use of force was objectively reasonable 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012)).

### 1. The City

Defendants argue that the City is entitled to summary judgment because Plaintiff fails to identify any custom or policy of the City that resulted in the alleged use of excessive force against Plaintiff. *Monell v. Department of Social Services of City of New York* established that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." 436 U.S. 658, 694 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. Thus, "[a] local governing body may be liable for monetary damages under § 1983" only "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority."

*Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell,* 436 U.S. at 690; *Valentino v. Village of South Chicago Heights,* 575 F.3d 664, 674 (7th Cir. 2009)).

Plaintiff's amended complaint does not identify any policy or widespread practice or custom that led to the alleged use of excessive force against him. Nor does Plaintiff allege that his injury was caused by an official with final policy-making authority. Plaintiff's deposition testimony does nothing to cure these pleading defects. The closest Plaintiff comes is testifying that he believed that Chief Smith "gave [his officers the] illegitimate tactic" of cuffing Plaintiff behind the back, rather than in the front as Plaintiff had requested due to "an old injury." [57-7] at 7, Tr. p. 25:12-17. However, the video evidence "blatantly contradicts" any suggestion that Plaintiff was cuffed in back when he was placed under arrest. *Scott*, 550 U.S. at 380. Instead, a handcuff was placed on Plaintiff's right wrist only, and attached to the bench at Plaintiff's side. Therefore, the City is entitled to summary judgment on Plaintiff's Section 1983 claim.

### 2.    Chief Thomas

Defendants argue that Chief Thomas is entitled to summary judgment on Plaintiff's excessive force claim because there is no evidence that he had any involvement in the questioning or arrest of Plaintiff. Section 1983 "does not establish a system of vicarious liability; a public employee's liability is premised on her own knowledge and actions, and therefore requires evidence that each defendant, through her own actions, violated the Constitution." *Aguilar v. Gaston–Camara*, 861 F.3d 626, 630 (7th Cir. 2017); see also *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (public employee may not be held liable under § 1983 "unless they had some personal involvement in the alleged constitutional deprivation"). Chief Thomas provides a declaration stating that he was not at the Station during the time Plaintiff was questioned and arrested; Plaintiff testified that he did not recall seeing Chief Thomas at the Station on that date;

and Chief Thomas does not appear in any of the videotapes that record the questioning and arrest of Plaintiff. According to his undisputed declaration, the only knowledge Chief Smith had of the events came after the fact when he reviewed and saved the surveillance video of Plaintiff's questioning and arrest. Based on this record, Chief Thomas is entitled to summary judgment.

### 3. Officer Peterson and Sergeant Stewart

Officer Peterson and Sergeant Stewart both argue that they are entitled to summary judgment on the merits of Plaintiff's excessive force claim, as well as based on qualified immunity. "The qualified immunity doctrine provides defendants immunity from suit, not just a defense to liability." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Though it is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune." *Id.* "When examining a qualified immunity claim, we consider two questions: '(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation.'" *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017) (quoting *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014)). The Court "may address these issues in whatever order seems best for the case at hand." *Sebesta*, 878 F.3d at 233. The Court may also "grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). That is the course the Court will take here.

"The law is 'clearly established' when 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'" *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Campbell v.*

*Peters*, 256 F.3d 695, 701 (7th Cir. 2001)). The Court looks first to controlling Supreme Court precedent and Seventh Circuit decisions on the issue. *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). "If no controlling precedent exists, 'we broaden our survey to include all relevant caselaw in order to determine whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000)). Alternatively, in some "rare cases" the constitutional violation may be "patently obvious" and the plaintiff may not be required to identify any analogous cases, if he can show that "the defendant's conduct was 'so egregious and unreasonable that … no reasonable [official] could have thought he was acting lawfully.' " *Id.* (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013)).

When determining whether the law was clearly established, "'the right allegedly violated must be defined at the appropriate level of specificity.'" *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The Supreme Court has "repeatedly told courts … not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S.Ct. 1148, 1148 (U.S. 2018). Although there need not be "'a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at 1152 (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (U.S. 2017)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551.

The Court will first evaluate the frisk that Officer Peterson performed immediately after informing Plaintiff that he was under arrest. Plaintiff claimed in his deposition that his testicles, back and knees were injured during the frisk due to Peterson shaking his pants "hard and furiously" while he was leaning against the wall with his hands up. [57-7] at 10, Tr. p. 34:11-22. However,

as noted above, Plaintiff's version of events is obviously contradicted by the video recording of the pat-down, which does not show any shaking of Plaintiff's pants or any sudden movements by Officer Peterson or Plaintiff. Instead, the video shows that Officer Peterson patted down Plaintiff's torso, legs, and groin area and emptied Plaintiff's pants pockets. See [57-6], Ex. F, video from in-house camera, approx.. 4:40 to 4:42. Further, the video shows that Plaintiff did not make any objections to the way he was positioned on the wall (for instance, he did not say that he was unable to stand against the wall with his hands up due to his pre-existing back injury). Nor did Plaintiff give any indication verbally that he was in pain while the search was being conducted (as one might expect of someone who had just been "violently" hit in the testicles). Further, the medical records from Plaintiff's visit to the emergency room the next day recorded that Plaintiff's testes were "normal" and showed "no swelling and no tenderness." [57-8] at 26-27. The Court nonetheless assumes for purposes of its analysis that the search did cause pain to Plaintiff's testicles, back, and knees.

Under these facts, Officer Peterson did not violate any clearly established constitutional right. "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *Campbell v. Miller*, 499 F.3d 711, 716-17 (7th Cir. 2007) (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)) (internal quotation marks omitted). Thus, "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Id*. at 717 (quoting *Robinson*, 414 U.S. at 235). In this case, it is undisputed that Officer Peterson had probable cause to arrest Plaintiff for harassment based on the text messages Plaintiff allegedly sent to the complainant. In his deposition, Plaintiff did not deny sending the harassing text

messages, see [57-7] at 12, Tr. p. 42:6-10, copies of which Defendants have included as part of the record, see [57-1], and authenticated through the declaration of Chief Smith, see [57-3] at 3. Plaintiff also does not dispute that the complainant wanted to press charges against him. See [57-2] at 1, ¶ 6 (Declaration of Sergeant Stewart). Therefore, Officer Peterson had probable cause to arrest Plaintiff and was justified in performing a full search of Plaintiff upon placing him under arrest. See, e.g., *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003) ("The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate.").

Of course, this does not mean that Officer Peterson was free to perform the search in any manner he chose. A "relatively extensive exploration of the person" is permissible, but an "extreme or patently abusive" search is not. *Campbell*, 499 F.3d at 717. Nonetheless, Plaintiff has not identified, and the Court has not discovered, any clearly established law under which Officer Peterson's search of Plaintiff could be considered extreme or patently abusive when considered in the light depicted by the in-house video, *Scott*, 550 U.S. at 381, and, to the extent not "blatantly contradicted" by the video, *id*. at 380, the light most favorable to Plaintiff. Given the facts in the record, "the only right plaintiff[] can assert" would be the right to be patted down in a manner that does not result in his pants making contact with his testicles, and "[w]e find no Seventh Circuit precedent clearly establishing such a right." *Day v. Wooten*, 947 F.3d 453, 463 (7th Cir. 2020).

"[T]he search of a suspect's crotch area incident to arrest is reasonable if the search is calculated to uncover evidence or a weapon and the suspect's private parts are not exposed to the public." *Maldonado v. Pierri*, 2010 WL 431478, at *7 (N.D. Ill. Feb. 1, 2010); see also *United*

*States v. Brown*, 233 Fed. Appx. 564, 568–69 (7th Cir. 2007) ("[a] search of the private areas of a suspect's body is reasonable if the suspect's private parts are not exposed to onlookers"); *United States v. Jackson*, 377 F.3d 715 (7th Cir. 2004) (permitting search of crotch area incident to arrest). Here, the pat-down of Plaintiff's crotch area was performed over his clothes, resulted in no exposure of his private parts to the public or the officers, was over in less than a minute, and was not accompanied by any troublesome comments from Officer Peterson or Sergeant Stewart. Compare *Schmidt v. City of Lockport*, 67 F. Supp. 2d 938, 944-45 (N.D. Ill. 1999) (police officer's alleged actions during custodial search incident to arrest, consisting of reaching under arrestee's sweater and feeling her bare breasts with both hands, went beyond proper scope of full search incident to arrest and constituted extreme and unreasonable search in violation of Fourth Amendment, absent specific suspicions that arrestee harbored contraband or weapons; officer also was not entitled to qualified immunity); *Stewart v. Rouse*, 1999 WL 102774, at *4 (N.D. Ill.  Feb. 22, 1999) ("Aggressively grabbing, groping or fondling the genitals of a handcuffed arrestee, while joking about it to a fellow officer, may well not constitute a reasonable search under the Fourth Amendment.").

Further, Plaintiff does not dispute that the pat-down is "a standard protocol at the Mendota Police Department" for "suspects that have been placed under arrest" and is intended "to ensure the safety of the officers as well as inmates and visitors by making sure the suspect is not carrying any weapons," as well as "to preserve potential evidence," since "weapons and other contraband can be hidden in the crotch area of an arrestee's pants."  [57-3] at 4 (Declaration of Chief Smith). While the Court takes Plaintiff at his word that his testicles hurt due to the pat-down, the video contradicts Plaintiff's claim that this was due to Officer Peterson shaking his pants "hard and furiously," 57-7] at 10, Tr. p. 34:11-22, and Plaintiff offers no other explanation for his alleged

extreme testicular pain that could be squared with the video (for instance, Officer Peterson squeezing his testicles while removing objects from his pockets) and no medical evidence showing any injury to his testicles. Based on this record, Officer Peterson's pat-down of Plaintiff's crotch area did not violate any clearly established constitutional right.

The Court also takes Plaintiff at his word that the search caused pain in his back and knees. But again, Plaintiff's explanation that this pain was caused by Officer Peterson shaking his pants "hard and furiously," [57-7] at 10, Tr. p. 34:11-22, is clearly belied by the in-house video. Further, Plaintiff does not claim, and the video does not show, the application of any force directly to Plaintiff's back or knees. Perhaps, given Plaintiff's pre-existing back injury and back pain, being placed against the wall with his hands up might have exacerbated his condition. According to Plaintiff's deposition testimony, Officer Peterson was aware of his back injury. "[A]n officer's otherwise reasonable conduct may be objectively unreasonable when the officer knows of an arrestee's medical problems." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). However, there is no suggestion from Plaintiff's deposition testimony or the video evidence that Plaintiff told Officer Peterson, or that Officer Peterson had any other way of knowing, that the simple act of standing with his hands against the wall and legs apart while being patted down would injure or cause pain to Plaintiff's back or knees. Given the facts in the record, the only right Plaintiff can assert would be the right of an arrestee not to be placed against a wall with hands up when the officer conducting a pat-down knows that the arrestee has a pre-existing back injury. Once again, "[w]e find no Seventh Circuit precedent clearly establishing such a right." *Day*, 947 F.3d at 463; cf. *id.* at 462 ("absent any indication an officer is aware the handcuff tightness or positioning is causing unnecessary pain or injury, the officer acts reasonably in not modifying the handcuffs").

The Court now turns to Plaintiff's claim that he was handcuffed in a manner that constitutes

the unreasonable use of force. The Seventh Circuit has "on occasion recognized valid excessive force claims based on overly tight handcuffs." *Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (citing *Payne v. Pauley*, 337 F.3d 767, 774–75, 780-81 (7th Cir. 2003) (denial of defendants' motion for summary judgment proper where there was evidence that arresting officers handcuffed plaintiff so tightly she lost feeling in her hands and refused to loosen the cuffs when she told them of the numbness and later underwent two carpal tunnel surgeries she said were necessitated by the handcuffing); *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1043-44 (7th Cir. 2002) (plaintiff was entitled to a jury trial on her excessive force claim where she produced evidence that the arresting officer lacked probable cause for the arrest, shoved her to the ground even though she was not resisting, cracked her tooth by forcing a breath-screening device into her mouth, waited over an hour to loosen handcuffs she complained were too tight, and subjected her to blood and urine testing at a hospital, even though she had passed all field sobriety tests and had registered a 0.00 Breathalyzer reading); *Lester v. City of Chicago*, 830 F.2d 706, 714 (7th Cir. 1987) (a properly instructed jury could have found excessive use of force if it believed plaintiff's testimony that even though she did not resist arrest, officers threatened to punch her with a closed fist, kneed her in the back, dragged her along the floor down a hallway, and handcuffed her so tightly her wrists were bruised; it was also for jury to determine whether there was probable cause to arrest plaintiff for disorderly conduct when she came to pick up her father at the police station)).

The Court finds *Tibbs* most instructive here. In that case, the Seventh Circuit affirmed the grant of summary judgment for defendant police officers on the merits of Tibbs' excessive force claim, rather than on qualified immunity. The record in *Tibbs* "indicat[ed] the following: Tibbs likely suffered some discomfort and pain from handcuffs that Officer Kooistra applied somewhat too tightly; Tibbs complained to Officer Kooistra once about his handcuffs without elaborating on

any injury, numbness, or degree of pain; Tibbs was handcuffed for about twenty-five to thirty minutes (from the time of his arrest to his arrival at the lockup facility); he experienced redness on his wrists for less than two days; and he neither sought nor received medical care for any alleged wrist injury." 469 F.3d at 666. On these facts, the Seventh Circuit "agree[d] with the district court that no reasonable jury could find Officer Kooistra's actions were objectively unreasonable." *Id*.

Similarly, in this case, the video from the in-house camera and the deposition testimony of Plaintiff (to the extent it is not blatantly contradicted by that video) show the following: Plaintiff may have suffered some discomfort and pain from Officer Peterson initially applying the handcuff somewhat too tightly; Plaintiff complained to Officer Peterson and Sergeant Smith once about the handcuff without elaborating on any injury, numbness, or degree of pain; Sergeant Smith immediately loosened the handcuffs once Plaintiff complained; Plaintiff acknowledged in his deposition that the handcuffs were not too tight once they were loosened, though claimed he was still in discomfort due to swelling; Plaintiff was handcuffed for less than ten minutes total (from the time of his arrest to his release when taken for booking); and Plaintiff had a contusion (bruise) on his wrist the day after, but did not show any loss of strength or range of motion in his wrist or require any medical treatment. Comparing this case to *Tibbs*, which involved similar facts but a longer period during which the plaintiff was handcuffed and a refusal to loosen the handcuffs once the plaintiff made a generalized complaint of pain—as well as *Payne*, *Herzog*, and *Lester*, which all involved much more severe facts—the Court concludes that there is no clearly established right of an arrestee not to have cuffs applied too tightly for less than two minutes, where the cuffs are immediately loosened after the arrestee makes a generalized complaint of pain and the arrestee requires no medical treatment. See also, e.g., *Sow v. Fortville Police Dep't*, 636 F.3d 293, 304 (7th Cir. 2011) (affirming grant of summary judgment to defendant police officer on excessive

force claim based on overly tight handcuffs where plaintiff complained once but presented no evidence that he elaborated on the pain to the defendant or required any medical treatment); *Stainback*, 569 F.3d at 773 & n.7 (affirming grant of summary judgment to defendant police officers on excessive force claim based on overly tight handcuffs where, at most, the record showed that plaintiff "said that he did not want to be handcuffed because he thought it would hurt" and "complained generally about pain after he was handcuffed … without any elaboration regarding a preexisting injury or other infirmity," even though plaintiff suffered two torn rotator cuffs that required medical treatment).

Finally, the Court considers the allegation from Plaintiff's amended complaint that, when Sergeant Stewart was escorting Plaintiff to the booking room for fingerprinting, Sergeant Stewart "grabbed my shirt chest" and "move[d] me with his hands." [41] at 12. In one of his responses to summary judgment, Plaintiff also asserts: "After I was searched I was walked into the fingerprint room as I was walking to the room [Sergeant] Stewart grabbed my chest and struck me causing physical harm while he threatened me. [Sergeant] Stewart then acted in unreasonable force when he hit my chest and with his arm and hands he pulled and pushed me into the Fingerprint Room while doing this he threatened my and they also threatened me in the room I was detained." [74] at 4-5. In another response to summary judgment, Plaintiff makes no mention of being "struck" or "hit" but instead asserts that during the walk to the fingerprint room, Sergeant Stewart "chest bumped me and forceably used his hands to grab me and shove me in an unreasonable manner practically sexually assaulting me on the walk … while he verbally threatened me." [86] at 14.

Sergeant Smith and Officer Peterson provided sworn declarations stating that Plaintiff was fingerprinted and booked without incident. See [57-1] at 4, ¶ 4; [57-2] at 3, ¶ 23. To counter these declarations, Plaintiff was required by Federal Rule of Civil Procedure 56 and Local Rule 56.1 to

provide his own affidavit or sworn declaration, or other evidence creating a factual dispute. See *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the put up or shut up moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." (internal quotation marks and citation omitted)). Plaintiff was specifically informed of this requirement, yet failed to comply. See [69] ("Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment" informing Plaintiff: "Rule 56 provides that you may NOT oppose summary judgment simply by relying upon the allegations in your complaint. Rather, you must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising material issues of fact for trial. Any witness statements must be in the form of affidavits. You may submit your own affidavit and/or the affidavits of others. You may submit affidavits that were prepared specifically in response to defendant's motion for summary judgment.").

Even if Plaintiff had provided a sworn statement or other evidence in support of his vague accusations that Sergeant Stewart mistreated him on the way to be fingerprinted, none of these allegations appear in Plaintiff's sworn deposition testimony, during which Plaintiff was asked to talk about his "injuries one at a time." [57-7] at 7, Tr. p. 25:22-24. The Seventh Circuit has "long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168 (7th Cir. 1996). In his deposition, Plaintiff claimed injuries to his wrist (see *id*. at 8, Tr. p. 26), testicles, knees, and back (see *id*. at 9, Tr. p. 33). He makes no mention of any force used on or injuries to his chest. Further, the medical records from Plaintiff's visit to the emergency room the day after the incident reflect no complaints about any pain or

injury to Plaintiff's chest or any diagnosis of or treatment for a chest injury. See *id.* at 16-17, Tr. pp. 60-64; see also [57-8] at 21-29.

Even assuming Plaintiff failed to mention the alleged use of force on his chest due to a "memory lapse," see *Kopplin v. Wisconsin Central Ltd.*, 914 F.3d 1099, 1103 (7th Cir. 2019) (recognizing exception to "sham affidavit" rule where earlier testimony was result of a memory lapse)—which Plaintiff does not claim to be the case—the allegations in his complaint and response to summary judgment are too vague and conclusory to meet Plaintiff's burden of demonstrating that Defendants have violated any clearly established constitutional right. Cf. *Ybarra v. City of Chicago*, 946 F.3d 975, 979 (7th Cir. 2020) (explaining that "[a]pplication of the reasonableness test 'requires careful attention to the facts and circumstances of each particular case'" (quoting *Graham*, 490 U.S. at 396)).

"The right to make an arrest necessarily carries with it the right to some degree of physical coercion to effect it," and therefore "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Sow*, 636 F.3d at 304 (town police officer did not use excessive force in allegedly pushing arrestee into police car, causing arrestee to bump his head); see also *Stainback*, 569 F.3d at 772 (explaining that "[a]n officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest," though "that right is circumscribed by the Fourth Amendment's insistence on reasonableness"). Further, "alleged verbal abuse and ridicule" have been held not to violate an arrestee's rights under the Fourth Amendment. *Doe v. City of Chicago*, 931 F. Supp. 600, 602 (N.D. Ill. 1996); see also *Slagel v. Shell Oil Refinery*, 811 F. Supp. 378, 382 (C.D. Ill. 1993). Plaintiff's nonspecific allegations that his shirt was grabbed, he was pushed and pulled, subjected to verbal "threats," and "practically sexually assaulted" are insufficient to support

a Fourth Amendment violation. Further, none of Plaintiff's submissions describe how he was purportedly "hit" or "struck"—with a hand, closed fist or other object, soft or hard, unprovoked or due to Plaintiff struggling or resisting? Nor does Plaintiff describe the "physical harm" he allegedly suffered—harm that is not mentioned anywhere in his medical records or his deposition. Based on this record, Plaintiff has entirely failed to demonstrate that Sergeant Stewart violated a clearly established right to be free of the use of excessive force when he escorted Plaintiff to fingerprinting.

To the extent that Plaintiff intended to bring failure to intervene claims against Officer Peterson and Sergeant Stewart, Defendants are entitled to summary judgment on those claims, as well. Since Plaintiff's right to be free of the use of force alleged here "was not clearly established," it follows that Officer Peterson and Sergeant Stewart "would not have known that a constitutional violation was committed, and therefore, cannot be liable for failure to intervene" to prevent one another's alleged uses of excessive force. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

## II.     Sanctions

Defendants also have filed a motion seeking dismissal of this case with prejudice as a sanction for Plaintiff's harassing and vulgar communications with defense counsel throughout the history of this litigation. In support of their motion, Defendants have provided a flash drive containing voicemails that Plaintiff has left during the pendency of this litigation for defense counsel as well as the current police chief of Mendota, Greg Kellen, who is not a defendant in this case. The voicemails contain both unquestionably vulgar language (e.g., name-calling, including "mother fu****" and "b**** of the day," and a directive that counsel "go f*** his cousin") as well as physical threats (e.g., a threat to "smack [his] mouth"). Defendants submit that given the

persistence of Plaintiff's behavior, it is unlikely that evidentiary or small monetary fines will change Plaintiff's behavior, and thus they request dismissal with prejudice as an appropriate sanction.

As the Supreme Court has recognized, when parties misbehave during litigation, courts are not powerless to intervene and in fact may "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). Sanctions may be imposed pursuant to rule, statute, or the court's inherent authority. See *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980) (describing the "'well-acknowledged' inherent power of a court to levy sanctions in response to abusive litigation practices"). However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44; see also *Mach v. Will County Sheriff*, 580 F.3d 495, 502 (7th Cir. 2009). This is especially true when dealing with *pro se* litigants, and especially those who have self-reported mental challenges, see [57-7] at 4, Tr. p. 11. Still, persistent, reprehensible conduct, even by a *pro se* litigant, can warrant sanctions up to and including dismissal with prejudice. See, *e.g.*, *Mohammad v. Anderson*, 2019 WL 3943669, at *3-*5 (N.D. Ill. Aug. 21, 2019).

Here, as in *Mohammad*, the combination of vile insults and physical threats easily crosses the line and warrants sanctions. However, in view of the disposition in favor of Defendants on the merits, Defendants' request for dismissal with prejudice [65] is denied as moot. But this does not end the matter. Given the egregious and highly inappropriate nature of those communications, the Court will refer Plaintiff to the Executive Committee of the Northern District of Illinois for a determination of whether to impose filing restrictions or other sanctions and/or discipline on Plaintiff.

### III.    Conclusion

For the reasons stated above, Defendants' motion for summary judgment [55] is granted and Plaintiff's motion to dismiss [71] is denied.  In view of the disposition in favor of Defendants on the merits, Defendants' motion for dismissal with prejudice as a sanction for Plaintiff's harassing and vulgar communications with defense counsel [65] is denied as moot.  However, given the egregious and highly inappropriate nature of those communications, the Court will refer Plaintiff to the Executive Committee of the Northern District of Illinois for a determination of whether to impose filing restrictions or other sanctions and/or discipline on Plaintiff.  Because this order resolves all of the remaining claims in the case, a final judgment will be entered under Federal Rule of Civil Procedure 58 in favor of Defendants and against Plaintiff and this civil case will be terminated.

Dated: March 10, 2020

_____
Robert M. Dow, Jr.
United States District Judge